# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# MARTINSBURG

PATRICE RUFFIN, a/k/a "KARMA,"
on behalf of herself and all others
similarly situated,

      Plaintiff,

v.                                                   CIVIL ACTION NO. 3:11-CV-19
                                                   (JUDGE GROH)

ENTERTAINMENT OF THE EASTERN
PANHANDLE, INC., d/b/a THE LEGZ
CLUBS, et al.,

      Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION TO REOPEN CASE AND TO ENTER CONSENT JUDGMENT

On November 22, 2013, the Plaintiff filed a Motion to Reopen Case and to Enter Consent Judgment [Doc. 168]. This motion asks that the Court reopen this case and allow her to enter a consent judgment against Troy W. Erickson pursuant to the parties' settlement agreement. For the reasons that follow, the Court **GRANTS** the motion.

### I. Background

#### A. Procedural History Preceding the Pending Motion

Patrice Ruffin brought this case against Entertainment of the Eastern Panhandle, Inc. d/b/a The Legz Clubs ("Legz Martinsburg"), The Legz Club, Inc., Legz Morgan Town, Inc. d/b/a the Legz Clubs, T. Weston, Inc. d/b/a Legz Gold Club, and Troy W. Erickson on behalf of exotic dancers who had worked at these clubs. She alleged that the Defendants violated the Fair Labor Standards Act ("FLSA") and the West Virginia

Wage Payment and Collection Act. On March 7, 2012, the Court conditionally certified an FLSA collective [Doc. 95], and, on November 9, certified a Rule 23 class. [Doc. 126].

In March 2013, the parties reached a settlement, and the Court preliminarily approved it [Doc. 148]. The Defendants, however, failed to meet their financial obligations under the agreement. On August 1, 2013, the parties filed a motion requesting that the Court preliminarily approve a new settlement agreement–the Second Revised Settlement Agreement [Doc. 155]. On August 16, 2013, the Court did so and set a final fairness hearing [Doc. 159].

On September 13, 2013, the parties filed a Joint Motion for Final Settlement Approval, [Doc. 160] and the Named Plaintiff and her Counsel filed an Unopposed Motion for Attorneys' Fees, Litigation Expenses, Settlement Administration Expenses, and Named Plaintiff Incentive Award. [Doc. 161]. The Court held the final fairness hearing on September 27, 2013. That same day, it entered an order approving the Second Revised Settlement Agreement and granting attorneys' fees, expenses, and an incentive award [Doc. 164]. The Court amended this order on October 1, 2013[1] to correct a clerical error made concerning the incentive award [Doc. 166]. The amended order states that the Court "shall retain jurisdiction over the Parties to the Second Revised Settlement Agreement only for the purpose of (a) supervising the implementation, enforcement, construction, and interpretation of the Second Revised Settlement Agreement, (b) supervising the administration and distribution of the

---

[1] The case's status is set to closed as of this date.

2

Settlement Fund, and (c) resolving any disputes that may arise with respect to any of the foregoing." *Id.* ¶ 12.

**B. The Second Revised Settlement Agreement**

The Second Revised Settlement Agreement resolved the Plaintiff's claims for $347,000. ([Doc. 160-4] § VII(a)). Section VIII of the agreement sets forth the payment schedule for this amount less $5000 that the Defendants had paid under the first agreement. *Id.* It therefore requires that the Defendants wire $6000 to a client trust account "[b]eginning August 15, 2013, and continuing every 15th day of the month for 23 consecutive months thereafter." *Id.* § VIII(b). The Defendants must wire a balloon payment of $198,000 to the account thirty days after making the last $6000 payment. *Id.* § VIII(c).

If the Defendants default on any payment, the Plaintiff may file a consent judgment for the remaining balance against Troy Erickson, the proprietor of Legz Martinsburg. Section X(c) outlines the circumstances in which this option triggers:

> In the event Defendants do not make any of their scheduled payments . . . and either do not cure the deficiency within 45 days of Defendants' Counsel receiving written notice of the deficiency or provide Plaintiffs' Counsel proof of the deficiency being caused by one or more of the following:
>
> > (1) Troy Erickson personally filing for bankruptcy;
> >
> > (2) Entertainment of the Eastern Panhandle, Inc. ("Legz Martinsburg"), filing for bankrupcy;
> >
> > (3) The loss, suspension, cancellation, or non-renewal of any license, permit, certificate of occupancy or other document necessary to keep Legz Martinsburg, in business; or
> >
> > (4) Any catastrophic loss (through fire, natural disaster or Act of

3

> God) that prevents Legz Martinsburg from operating profitably for
> more than two months,

within 45 days of Defendants' Counsel receiving written notice of the deficiency, Plaintiffs will file the Consent Judgment and shall be immediately entitled to full payment of the $347,000 by Defendant Troy W. Erickson. The $347,000 owed shall be reduced by amounts already paid under this Agreement as of the date the Consent Judgment is filed.

### C. The Motion to Reopen Case and to Enter Consent Judgment

On November 22, 2013, the Plaintiff filed the pending Motion to Reopen Case and to Enter Consent Judgment [Doc. 168]. Her motion asks that the Court reopen this case and enter the consent judgment pursuant to Section X(c). The Defendants did not respond to this motion. On January 10, 2014, the parties stipulated to the authenticity of the Exhibits A through V that are attached to the Plaintiff's motion [Doc. 170].

The Court held an evidentiary hearing concerning the Plaintiff's motion on January 17, 2014. At the hearing, the Defendants asserted that they did not oppose it and did not argue that any of Section X(c)'s defenses allowed them to avoid its entry. Hr'g Tr. 2:1-12, 44:6-11, 45:3-46:1.

### D. Facts Underlying the Plaintiff's Motion

The following facts are pertinent to disposition of the Plaintiff's motion. On August 1, 2013, a shooting occurred at Legz Martinsburg. Pl.'s Ex. J. The Defendants missed that month's payment, but timely cured their default. Pl.'s Exs. C, D. They then missed the September 16, 2013[2] deadline for the second $6000 payment. Pl.'s Ex. E. The Plaintiff's Counsel, Anna Prakash, sent the Defendant's Counsel, Raymond

---

[2] The Defendants could not have made the payment on September 15, 2013 because that date was a Sunday.

Vasvari, a letter on September 17, 2013. *Id.* This letter stated that the Defendants had not made the September payment and that the Plaintiff intended to file the consent judgment if they did not cure this default or provide proof that an exception exists to its filing under Section X(c) within forty-five days of the letter. *Id.* On September 20, 2013,[3] Mr. Vasvari sent Ms. Prakash a letter that stated, "You should know that in August the business suffered a major event, from which it has recovered." Pl.'s Ex. F. The letter then refers to the shooting that had occurred at Legz Martinsburg. *Id.* This shooting, Mr. Vasvari wrote, led the West Virginia Alcoholic Beverage Control Commission ("WVABCA") to require that the club install metal detectors and otherwise improve security. *Id.* His letter further stated:

> Despite these unfortunate events, the club is up and running, and while the unusual nature of the events might have justified seeking to be excused from our first and second payments until a later date, we have chosen to make those payments as soon as possible - despite the recent financial hardship of the club - because that hardship is atypical, and because we remain committed to the settlement terms we negotiated.

*Id.*

The Defendants then missed the October 15, 2013 payment. *See* Pl.'s Ex. G. On October 16, 2013, Ms. Prakash sent Ms. Vasvari another letter notifying him of the October non-payment. *Id.* She followed up with an email on October 24, 2013. Pl.'s Ex. H. This email noted that the forty-five-day period would soon end for the September payment, and asked whether the Defendants intended to make the payments. *Id.* That same day, Mr. Vasvari responded to her email, asking what she

---

[3] The letter is dated March 21, 2013, but the parties' later correspondence makes it clear that the correct date is September 20, 2013. *See, e.g.*, Pl.'s Ex. J.

5

counted as the forty-fifth day. Pl.'s Ex. I, at 2. Ms. Prakash responded that November 1, 2013 was the September payment's deadline. *Id.*

On October 31, 2013, Mr. Vasvari sent Ms. Prakash a letter. Pl.'s Ex. J. He rescinded the statement that he made in his September 20, 2013 letter. *Id.* at 1. He then stated that the Defendants were invoking Sections X(c)(3) and (4) to avoid the consent judgment "due to the shooting which took place at Legz Martinsburg at the beginning of August, the subsequent temporary forced shutdown of the club, the extraordinary security costs required as a prerequisite of its reopening, and the dramatic loss of business afterward." *Id.* In support of this position, Mr. Vasvari asserted:

> Attached is an [sic] Suspension Order entered by the West Virginia Alcohol Beverage Control Commission that constitutes a "suspension" within the meaning of Section X(C)(3) . . . and a letter from the Commissioner of the same conditioning the club being reopened upon the implementation of various upgraded security measures, and then on a probationary basis.
>
> We also contend that the losses suffered by the club, through no fault of its own and as a result of an extraordinary happenstance, constitute a catastrophic loss within the meaning of Section X(c)(4), which has prevented the club from operating profitably for at least two months.

*Id.* Mr. Vasvari's letter included an order from the WVABCA that suspended the Class A/Private Club License of Legz Martinsburg for ten days–from August 2, 2013 through August 11, 2013–due to the August 1, 2013 shooting. *Id.* at 3-4. Mr. Vasvari also included a letter dated August 12, 2013 from the WVABCA regarding the status of the license. *Id.* at 2. The WVABCA letter stated that, as a condition of the club reopening that day, the license would be placed on a thirty-day probation period, and Mr. Erickson

6

needed to implement the planned security measures. *Id.*

On November 7, 2013, Mr. Vasvari emailed Ms. Prakash, stating that he had "been told to expect an answer viz payment schedule from [his] client tomorrow." Pl.'s Ex. K. The next day, he emailed her stating that he had not heard from the Defendants and would call "next week as soon as [he had] some information." Pl.'s Ex. L.

On Friday, November 8, 2013, Legz Martinsburg closed. Hr'g Tr. 38:21. Several days after its closing, on November 12, 2013, Mr. Vasvari emailed Ms. Prakash again. Pl.'s Ex. M. He wrote: "I learned this just [sic] morning that Legz Martinsburg has failed, and is no longer a going concern. The club closed its doors on Friday. It has no revenue from which to pay what it owes. If you are inclined to file the confession of judgment, you should do so." *Id.* Later that same day, after an apparent phone call with Ms. Prakash, Mr. Vasvari sent her the following email:

> As I explained, the Legz Club has failed as a business.
>
> No further payments under the settlement agreement can be expected at this time.
>
> When we last spoke before today, you suggested that future non-payment would result in your filing the execution of judgment.
>
> At that time, I told you we might well contest the validity of the filing based on the events which have led to non-payment.
>
> Notwithstanding my last (and in-artfully-drafted) email, we stand by the position stated in my letter dated October 31, 2013 . . . .
>
> My suggestion that "you should file the confession if so inclined" was a poor choice of words. It was not meant to retreat from the position just stated, nor to suggest that the conditions precedent to that filing written into the Revised Settlement Agreement have come to pass, nor to imply that we would not contest any such a filing as premature or otherwise improper.

7

> Rather, I meant only to imply that I think the parties have come to the impasse which you and I discussed several days ago, and that if you believe you are entitled to file the confession of judgment - while I do not - you should not forebear doing so based on any representation I may have made about forthcoming payments. Those payments are not in the offing in the foreseeable future. . . .

Pl.'s Ex. N.

On November 13, 2013, Ms. Prakash sent Mr. Vasvari a letter. Pl.'s Ex. O. This letter argued that neither Section X(c)(3) nor (4) applied. *Id.* For example, it stated that the Defendants had not provided any proof that Legz Martinsburg had not operated profitably following the license suspension or that the shooting caused any such unprofitable operation. *Id.* The Plaintiff also filed an executed version of the consent judgment that day [Doc. 167].

At the evidentiary hearing, Mr. Erickson testified regarding the events that led to the closure of Legz Martinsburg. Legz Martinsburg had over $40,000 in expenses every month. Hr'g Tr. 12:4-6. The month of the shooting, August 2013, it had $22,000 in gross receipts. *Id.* at 12:15-16. Its gross receipts for September 2013 and October 2013 were respectively $32,000 and $33,000. *Id.* at 12:19-24. Further, before the shooting, the club employed thirty dancers, but had twelve dancers when it closed. *Id.* at 27:8-11. Mr. Erickson testified that it was hard to open the business for seven days with twelve dancers. *Id.* at 27:10-11. In November 2013, Mr. Erickson decided to close the business based on two factors. *Id.* at 13:2-5. First, he explained that Legz Martinsburg "always ma[d]e relatively good receipts" from mid-September through February and that they "weren't seeing that." *Id.* at 13:6-11. He was not sure "if it was the economy" but he was "sure the shooting had a lot to do with it because [the club]

8

didn't get any of [its] dancers back or anything else." *Id.* at 13:11-14. The second factor was that the landlord was not willing to make certain repairs to the building. *Id.* at 13:14-17. Legz Martinsburg closed with all of the licenses and permits it needed to operate. *Id.* at 40:8-10. When asked at the hearing whether "there was [a] natural disaster or other similar act of God that forced [him] out of business," Mr. Erickson responded, "No, it was a man-made disaster." *Id.* at 40:13-15.

## II. Jurisdiction

When a party asks that a court reopen a case to enforce a settlement agreement, it is asking the court to resolve a contractual dispute. *See Fairfax Countywide Citizens Ass'n v. Fairfax Cnty., Va.*, 571 F.2d 1299, 1302 (4th Cir. 1978). The fact that the court oversaw the case giving rise to the settlement agreement does not vest it with jurisdiction to hear such a matter. *See id.* at 1303-05. A district court has ancillary jurisdiction to enforce a settlement agreement, however, when its order of dismissal contains "a provision 'retaining jurisdiction' over the settlement agreement." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994). Thus, because the dismissal order states that the Court retained jurisdiction over the parties "for the purpose of (a) supervising the implementation, enforcement, construction, and interpretation of the Second Revised Settlement Agreement," the Court has jurisdiction over the Plaintiff's motion. ([Doc. 166] ¶ 12.)

## III. Law

West Virginia law applies to this motion's disposition. In *Fairfax Countywide Citizens Ass'n*, the Fourth Circuit recognized that, even when a settlement agreement

terminated a federal claim (such as the Plaintiff's FLSA claim), state law applies to the agreement's interpretation. *See* 571 F.2d at 1303. That case involved plaintiffs who, like the Plaintiff here, sought enforcement of a settlement agreement that had resolved their federal claims. *Id.* at 1301-02. The Fourth Circuit stated that Virginia law governed the agreement's validity and interpretation after explaining that "[t]he settlement agreement . . . , while serving to terminate litigation of a federal claim, was a private contract entered into after private negotiations between the parties." *Id.* Moreover, courts in the Fourth Circuit have applied the law of the state in which the district court sits to dispose of settlement agreement disputes. *See **Killette v. Pittman**,* 127 F.3d 1099, 1997 WL 657005, at *5 (4th Cir. 1997) (applying South Carolina law to dispute over settlement agreement brought in District of South Carolina); ***Rewalt v. Draper & Goldberg, PLLC***, No. CIV.A. 3:06-0540, 2008 WL 2566957, at *4 (S.D. W. Va. June 24, 2008) (Southern District of West Virginia applying West Virginia law to settlement agreement dispute); ***Am. Contractors Indem. Co. v. Carolina Realty & Dev. Co.***, No. CA 7:09-2145-TMC, 2012 WL 2711802, at *3 (D.S.C. July 9, 2012) *aff'd*, 529 F. App'x 346 (4th Cir. 2013), *as amended* (July 2, 2013) (District of South Carolina applying South Carolina law to settlement agreement dispute).

Under West Virginia law, "[t]he general rule is that a compromise or settlement agreement is favored by law and is to be construed as any other contract. ***Floyd v. Watson***, 254 S.E.2d 687, 690 (W. Va. 1979). "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such

intent." Syl. pt. 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 128 S.E.2d 626, 628 (W. Va. 1962). But, "when a contract is ambiguous, it is subject to construction." *Estate of Tawney v. Columbia Natural Res., L.L.C.*, 633 S.E.2d 22, 28 (W. Va. 2006). An ambiguity is "language reasonably susceptible of two different meanings or language of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." *Id.* at Syl. pt. 4. In short, the court must construe "the contract according to its plain meaning" unless there is an ambiguity. *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 715 (W. Va. 1996).

## IV. Analysis

Because there is no alleged ambiguity in the settlement agreement, the Court will construe it according to its plain meaning. *See id.* In doing so, it must consider: (1) whether the Plaintiff met the settlement agreement's requirements to enter the consent judgment; and (2) whether the Defendants have a defense to its entry. The Court will address each of these issues in turn.

### A. Whether the Plaintiff Met Section X(c)'s Requirements to Enter the Consent Judgment

The Defendants did not make the September 2013 and October 2013 payments that were due under the settlement agreement. Pl.'s Exs. E, G. These deficiencies triggered the Plaintiff's ability to seek entry of the consent judgment as Section X(c) applies "[i]n the event Defendants do not make any of their scheduled payments." ([Doc. 160-4] § X(c)). Under Section X(c), the Plaintiff can enter the consent judgment only if her counsel gave the Defendants written notice of the missed payments. *Id.* Section X(c) implies this requirement by stating that the Defendants have an

11

opportunity to cure their default that begins upon their counsel "receiving written notice of the deficiency." *Id.* The letters that Ms. Prakash sent to Mr. Vasvari constituted such notice because they stated that the Defendants had not made the September and October payments. Pl.'s Exs. E, G. The Defendants have not argued that they are inadequate in this regard. Section X(c) imputes no other requirement on the Plaintiff before she may enter the consent judgment. Accordingly, the Plaintiff may enter the consent judgment unless the Defendants have a defense under Section X(c). As discussed next, however, no such defense applies.

**B. Whether the Defendants Have a Defense to the Consent Judgment**

Upon receiving Ms. Prakash's letters concerning the September and October payments, the Defendants could avoid the consent judgment only if, within forty-five days from the date of each letter, they (1) made the payment; or (2) provided the Plaintiff's Counsel with "proof of the deficiency being caused by one or more of" four defenses listed in Section X(c)(1)-(4). ([Doc. 160-4] § X(c)). They therefore had until November 1, 2013 to take one of these actions as to the September 2013 payment and until December 2, 2013[4] as to the October 2013 payment. They timely chose the latter option by sending Ms. Prakash a letter on October 31, 2013 that raised Section X(c)(3) and (4) as defenses. *See* Pl.'s Ex. J. At the evidentiary hearing, however, the Defendants asserted that they are not raising those defenses in this matter as they do

---

[4] November 30, 2013 was the forty-fifth day following the October 16, 2013 letter that gave notice of the missed October payment. Because November 30th was a Saturday, the due date was the following Monday, December 2, 2013, as the parties incorporated the time computation provisions of the Federal Rules of Civil Procedure into their agreement. ([Doc. 160-4] § XVII(h)).

not oppose the Plaintiff's motion. Hr'g Tr. 2:1-12, 44:9-11. Regardless, the Court will analyze the potential applicability of these defenses in turn.[5]

### i. Subsection (3) Defense

To invoke subsection (3), the "loss, suspension, cancellation or non-renewal of any license, permit, certificate of occupancy or other document necessary to keep Legz Martinsburg, in business" must have caused the Defendants to miss the September and October payments. ([Doc. 160-4] § X(c)(3)). The Defendants also must have "provide[d] Plaintiffs' Counsel proof of the deficiency being caused by" this provision within forty-five days of receiving written notice of each deficiency. *Id.* § X(c).

The Defendants cannot invoke subsection (3) because they did not provide proof to the Plaintiff's Counsel that this defense applied within the forty-five-day time frame. Mr. Vasvari's October 31, 2013 letter is the only evidence that goes to show that the Defendants provided the proof required by Section X(c). *See* Pl.'s Ex. J. The Defendants did offer evidence showing that a suspension occurred as they included documentation concerning the temporary suspension of Legz Martinsburg's private club license. However, they also needed to provide proof that the suspension caused them to miss the payments. Their letter failed in that regard. For example, it did not attach any documentation showing that Legz Martinsburg had become unprofitable. Indeed, such evidence only came to light at the evidentiary hearing. The letter at most implied that the shooting caused the Defendants to lack sufficient funds as they asserted that

---

[5] Subsections (1) or (2) do not apply because neither Troy Erickson nor Entertainment of the Eastern Panhandle, Inc. have filed for bankruptcy. Hr'g Tr. 41:18-22.

the shooting, temporary shutdown, "extraordinary security costs," and "dramatic loss of business afterward" led them to invoke subsections (3) and (4). *Id.* But Section X(c) requires proof that these circumstances caused them to miss the payments, not a bare allegation of hardship. The Defendants therefore failed to satisfy the proof requirement as to subsection (3) and cannot invoke it as a defense.

Even if the Defendants had provided the necessary proof, they have not shown that the license suspension caused them to miss the September and October payments. The WVABC only suspended Legz Martinsburg's license for ten days in August. Pl.'s Ex. J, at 2-4. The club had all of the licenses that it needed to operate during the latter half of August until Mr. Erickson decided to close it in November. *See* Hr'g Tr. 40:8-10. While it was operating at a loss when the payments were due, *see* Hr'g Tr. 12:4-6, 15-16, 19-24, Mr. Erickson's testimony demonstrates that the shooting–not the ten-day suspension–put Legz in that financial position. For example, when discussing his decision to close the club, Mr. Erickson stated that he was "sure the shooting had a lot to do with" the club not making as much as it usually did. *See* Hr'g Tr. 13:9-14. Accordingly, the Defendants have no defense under subsection (3) as they did not provide proof of this provision's application to the Plaintiff's Counsel and, even if they had, the temporary suspension did not cause the deficiencies.

### ii. Subsection (4) Defense

To invoke subsection (4), the Defendants must show that "[a]ny catastrophic loss (through fire, natural disaster or Act of God) that prevent[ed] Legz Martinsburg from operating profitably for more than two months" caused them to miss the September and

October payments. ([Doc. 160-4] § X(c)(4)). Like with subsection (3), they can rely on this defense only if they gave the Plaintiff's Counsel proof that this provision applied within forty-five days of receiving Ms. Prakash's letters concerning the deficiencies. *Id.* § X(c).

Contrary to the Defendants' position in their October 31, 2013 letter, the August shooting at Legz Martinsburg does not trigger subsection (4). The agreement states that the "catastrophic loss" must have occurred "through fire, natural disaster or Act of God." *Id.* § X(c)(4). A shooting does not qualify as any of these events. It is not a fire. It is not a natural disaster or Act of God as it occurs through an individual's actions, not through a natural cause. Indeed, Mr. Erickson testified to this effect as he stated that "a man-made disaster" led Legz Martinsburg to close. Hr'g Tr. 40:13-15. Accordingly, the Defendants cannot invoke this defense because the agreement limits it to particular types of occurrences that do not include a shooting.

## V. Conclusion

Having determined that the Plaintiff satisfied the settlement agreement's requirements to enter the consent judgment and that the Defendants have no defense to its entry, the Court **GRANTS** the Plaintiff's Motion to Reopen Case and to Enter Consent Judgment. The Plaintiff may enter the consent judgment for $336,000 pursuant to Section X(c) of the Second Revised Settlement Agreement. This amount reflects the gross settlement amount of $347,000 less the $5000 payment the Defendants made under original settlement agreement and the $6000 payment they made in August 2013.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record.

**DATED:** January 23, 2014.

GINA M. GROH
UNITED STATES DISTRICT JUDGE